UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Frank Enriquez, on behalf of himself and all others similarly situated,

Plaintiff,

v.

Easton-Bell Sports, Inc. and Riddell, Inc.,

Defendants.

Case No. 1:12-cv-20613

## AMENDED CLASS ACTION COMPLAINT

Frank Enriquez ("Plaintiff") brings this action individually and on behalf of a class of similarly-situated consumers who purchased football helmets designed, manufactured and marketed by Defendants Riddell, Inc., d/b/a Riddell Sports Group, Inc., and Easton-Bell Sports, Inc. ("Defendants"), on the false belief that the helmets were more effective in preventing concussions.

## INTRODUCTION

1.      Defendants design, manufacture and market a family of football helmet products under the trade name "Revolution," including, for example, the "360," "Speed," "Speed Classic," "IQ Hits," "IQ," "Speed Youth," "Edge Youth," "Youth," "Attack Youth," and "Little Pro" (collectively "Revolution Helmets").

2.      Defendants first introduced Revolution Helmets in 2002 and marketed them to football players of all ages as providing superior protection against concussions when compared to other helmets on the market.  Specifically, Defendants asserted those who wear Revolution

Helmets are "31 percent less likely to suffer a concussion compared to athletes who wore traditional football helmets."

3.     Defendants have charged a substantial premium for their "Revolution" products above the cost of regular helmets.  Defendants have supported this extra cost by pointing to the "technology" of the helmets and to the results of studies that purportedly demonstrate the effectiveness of the helmets at reducing concussion.

4.     Defendants have reported that "since [2002], over a half a million youth, high school, college, and professional [football] players have switched to the Revolution."

5.     According to experts, however, Defendants' claims of concussion reduction are false and misleading and their marketing efforts provide a false impression that the Revolution helmet is substantially better at preventing concussions than competing products.

6.     The federal government, including the U.S. Senate and Federal Trade Commission, has launched investigations into Defendants' claims regarding their Revolution helmets' ability to reduce concussion.

7.     Plaintiff and the members of the putative Class are purchasers of Defendants' Revolution products and have been damaged because the helmets they purchased were worth far less than represented, and because the helmets did not perform as advertised.

8.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 against Defendants seeking redress for breach of contract, unfair trade practices, deceptive trade practices, breach of express warranty, breach of implied warranty of fitness for a particular purpose and unjust enrichment.  Plaintiff seeks monetary and injunctive relief for similarly situated purchasers of Defendants' Revolution Helmets.

## JURISDICTION AND VENUE

9.      This court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from the Defendants; there are more than 100 Class members nationwide; and the aggregate amount in controversy exceeds $5,000,000.

10.     This Court has personal jurisdiction over the parties because Defendants each conduct substantial business in Florida and have had systematic and continuous contacts with Florida.

11.     Venue is proper in this District under 28 U.S.C. §1391(a)(2) because a substantial part of the events giving rise to the claim occurred in this District.  Plaintiff bought the Revolution Helmets in this District and therefore sustained their injury in this District.  This Court accordingly has jurisdiction over this action and venue is proper in this District.

## PARTIES

12.     Plaintiff Frank Enriquez resides in Miami, Florida. He purchased Riddell Revolution helmets. As a result of the unlawful conduct alleged herein, Plaintiff has been injured in his business or property.

13.     Defendant Riddell, Inc., d/b/a Riddell Sports Group, Inc. ("Riddell"), is an Illinois corporation with its principal place of business at 9801 W Higgins Road, Rosemont, Illinois. Riddell designs, manufactures, promotes, markets, distributes, and sells Revolution Helmets throughout the United States.

14.     Defendant Easton Bell Sports, Inc. ("Easton-Bell") is organized and exists under the laws of the State of Delaware and maintains its principal place of business at 7855 Haskell

3

Avenue, Suite 200, Van Nuys, California. Easton-Bell designs, manufactures, promotes, markets, distributes and sells Revolution Helmets throughout the United States.

## FACTUAL ALLEGATIONS

### I.   Factual Background Regarding Concussions

15.     Concussions are traumatic brain injuries that alter the way the brain functions. The milder effects of a concussion can include headache, lack of concentration, problems with memory and judgment, lack of coordination and difficulty with balance.  The more severe effects, often times brought on by repeated concussions, can include Chronic Traumatic Encephalopathy ("CTE") and Second Impact Syndrome.

16.     CTE is a progressive neurodegenerative disease caused by repetitive trauma to the brain which eventually leads to dementia and other neurological disorders.  Second Impact Syndrome is a condition in which the brain swells rapidly after the injured person suffers a second concussion before being able to properly heal from the first, causing substantial injury or death.

17.     Concussions occur when forces cause the brain to rapidly accelerate or decelerate within the skull causing the stretching, squeezing, and rotation of brain tissue.  Such forces cause immense tension to synapses and nerve endings within the brain at the molecular level and disrupt the brain's ability to function normally.

18.     Concussions can occur any time the head and upper body are violently shaken. This occurs most commonly when a blow is given to the head but can also occur whenever the head is forced to accelerate or decelerate rapidly.

19.     Concussion injuries to youth athletes are one of the most prevalent problems in high school sports today.  Dr. Dawn Comstock, Principal Investigator for the Center for Injury Research and Policy at the Nationwide Children's Hospital, found that 140,000 concussions are sustained per year by youth football players.  Among those who sustain concussions, a staggering 40% were returned to the field sooner than recommended.[1]

**II. Defendants' False Claims Regarding the Safety of Revolution Helmets**

20.     Defendants tout in their advertising, marketing and promotional materials that their Revolution Helmets are safer than other helmets because they reduce the risk of concussions. These claims are false. Revolution Helmets are not materially safer than other helmets with regard to concussion prevention.

21.     To support their safety claims, Defendants rely primarily on a 2003 University of Pittsburgh Medical Center ("UPMC") study that Defendants claim "found that athletes who wore the Riddell Revolution helmet were 31 percent less likely to suffer a concussion compared to athletes who wore traditional football helmets."  Defendant Riddell makes the following specific representations on the www.riddell.com website:

   a.   "While no helmet will prevent all concussions from occurring, this study suggests that the Revolution football helmet reduces the incidence of concussion in high school players when compared to helmets of traditional design."[2]

   b.   "The study, which will be published in February's edition of Neurosurgery, found that athletes who wore the Riddell Revolution helmet were 31 percent less likely to suffer a concussion compared to athletes who wore traditional football helmets. The authors of the study estimate that the Revolution's patented technology could translate to 18,000 to 48,000 fewer concussions among the 1.5 million high school players who participate in football each season."[3]

---

[1] http://www.nytimes.com/2010/01/31/sports/31concussions.html

[2] http://www.riddell.com/research-studies/2917/researchstudies_neurosurgerystudy/

[3] http://www.riddell.com/research-studies/2916/pressreleases_upmcstudy/

22.    Defendants also tout the UPMC study in online and print advertising.  One such advertisement for the Riddell Revolution Football helmet, states "Research published in the February 2006 issue of Neurosurgery reveals that players wearing the Riddell Revolution were 31 percent less likely to suffer a concussion than those wearing traditional football helmets."[4] Another advertisement appearing on the Professional Development Football League's website states, "The first edition of Revolution helmets helped in the prevention of concussions, and Riddell has been making improvements ever since."[5]

23.    Defendant Easton-Bell, on its website, makes the following claims regarding the safety of its Revolution Helmets:

a.  "Today at the American Football Coaches Association national convention, football helmet manufacturer Riddell announced the findings of a recent three-year study of more than 2,000 high school football players by the University of Pittsburgh Medical Center (UPMC) that shows that the Revolution football helmet provides significantly better protection against concussions."[6]

b.  "The Revolution helmet is a great first step in reducing the risk of concussion to the athlete, but we can't stress enough the importance of proper management when concussions do occur."[7]

24.    Defendants' statements regarding the supposed safety and effectiveness of their Revolution Helmets in reducing concussions are false.  Defendants not only falsely use the UPMC study to support their claims, but the study itself is so scientifically flawed that it is irrelevant and cannot be relied upon.

---

[4] http://www.youtube.com/watch?v=DJTdrNJG-Dc.

[5] http://thepdfl.com/?p=1149

[6] http://www.eastonbellsports.com/research-shows-riddell-revolution-football-helmet-provides-better-protection-against-concussions.

[7] *Id*.

25.     To begin, a UPMC Neurosurgeon and co-author of the UPMC article, Dr. Joseph Maroon, has stated he disagrees with Defendants' marketing of the 31% effectiveness figure without acknowledging the UPMC study's limitations.  Specifically, he stated:

> That was the data that came out, but the authors of that study on multiple occasions have recommended further investigations, better controls, and with larger numbers. If one is going to make statements relative to the paper we wrote, it should be with the limitations that we emphasized, and not extrapolated to studies that we suggest should be done and haven't been done yet.

26.     Dr. Robert Cantu, vice president of the National Operating Committee on Standards for Athletic Equipment ("NOCSE"), reviewed the UPMC study and has provided guidance on its relevance and meaning.  According to Dr. Cantu, the UPMC study is unreliable. He states the UPMC study "suffers from a serious, if not fatal, methodological flaw that precludes my not doubting the data, but my doubting the significance of the data."  Dr. Cantu points out the following problems with the study:

    a.  Doctors reviewing the article do not know the age of the helmets that comprised the non-Riddell group. Cantu states that new helmets test better than old helmets and that "it would be expected that if the newer [Revolution Helmets], therefore, are being compared to helmets that are significantly older, that the older helmets would not perform to as high a degree as the newer helmet."

    b.  The 25 concussions studied for the UPMC article were a unique subset of all concussions sustained because they involved "wide receivers or quarterbacks in the open field sustaining a hit to the side of the helmet that they did not see coming from an individual who essentially made a helmet to helmet collision." According to Dr. Cantu, therefore, it is an "open question" whether the improvements made for 3% of concussions is an improvement for the 97% of concussions that could not be studied.

    c.  The sample size of the injury group of athletes was too small to be statistically relevant.

    d.  The age group of the Riddell group was older than the age of the non-Riddell group and "research exists suggesting that the younger developing brain might be more easily concussed and recover more slowly than the older brain."

27.     Dr. Jeffrey Kutcher, Assistant Professor at the University of Michigan's Department of Neurology, and the Director of Michigan Neurosport, also points out the unreliability of the UPMC study.  While testifying in front of the U.S. Senate Committee on Commerce, Science, and Transportation, Dr. Kutcher stated that he did not believe it was reasonable for Defendants to rely upon the UPMC study to support their claims regarding the Revolution Helmet's safety. Specifically, Dr. Kutcher stated:

     a.    "[T]here are mainly two problems with that study: First, the two populations were not equal to the point where I would [] find the study to be designed to acceptable scientific protocol[s]. . . . Second, . . . the 31 percent figure is relative risk change. The absolute percent change is 2.6 percent. That amount could be more than accounted for by the study limitations."

28.     In addition to the problems described by Dr. Maroon (the study's own author,) Dr. Cantu, and Dr. Kutcher, the UPMC study suffers from inherent conflicts of interest that preclude any objective assessment of Revolution Helmets. These conflicts of interest include the facts:

     a.  Riddell provided a grant to underwrite the UPMC study - the same study that it stood to benefit from. This grant included salary support for two of the leading authors of the study. A third author is currently a Riddell employee.

     b.  Three of the study's authors are co-owners of ImPact, a company that manufactures and distributes computerized neurocognitive testing software. In 2003, Riddell and ImPact entered into a mutually beneficial business relationship.

     c.  Riddell included a "directional hypothesis" within the Research Proposal for the study which suggested the following relationships:

       i.  "Athletes wearing the Revolution will exhibit significantly fewer incidences of cerebral concussion compared to the [traditional helmet] group";

       ii.  "Athletes wearing the Revolution will exhibit fewer and shorter-duration-on-field markers of concussion severity as compared to the [traditional helmet] group";

       iii.  "Post-concussion neurocognitive dysfunction and post-concussive symptoms will resolve earlier in athletes wearing the Revolution helmet relative to athletes not wearing this helmet."

29.     Finally, a study conducted by the Cleveland Clinic published in the Journal for Neurosurgery: Spine, shows how Revolution Helmets are not effective in preventing concussions. The Cleveland Clinic study found that modern helmets, including the Riddell Revolution, Revolution Speed and Revolution IQ, were not good at absorbing the energy involved in low impact hits.  These low impact hits, which are the most frequent hits sustained by football players, cause concussions when repeatedly received by players.  In contrast to the UPMC study, which focused on just side impact high velocity hits, the Cleveland Clinic study researched and evaluated many different types of hits and angles of force.

30.     The Cleveland Clinic study also found that modern youth helmets are ineffective in protecting youth players because they are just scaled down versions of adult helmets. It states that these scaled down versions of the adult helmets fail to consider youth players' impact conditions, the size of the youth head, development of spinal musculature, immature brains and head-neck disparity.  Therefore, these helmets "may have energy absorbing features that are not optimized for these lower dose impacts."  As indicated by their names, such as Riddell Revolution Youth and Riddell Speed Youth,  Revolution helmets are just scaled down versions of the adult helmets.

31.     In reality, no helmet can prevent concussions.  Helmets do not and cannot manage the forces that cause the brain to suddenly and traumatically accelerate or decelerate within the skull. Though the inherent mass of a helmet may make it more difficult for the head or upper body to move violently, the helmet cannot prevent the brain from moving within the skull. Such movements of the brain are the main cause of concussions. Further, the rotational forces which twist and turn the brain within the skull are not properly understood yet, and therefore no technology has addressed how to manage these forces.

32.    The National Operating Committee on Standards for Athletic Equipment (NOCSE) has developed a severity index to assess the protective ability of helmets. A severity index of 1200 must be achieved for helmets to be on the market.  The lower the severity index score, the safer the helmet is considered to be.  Dr. Cantu, Vice President of NOCSE, states that in order to prevent concussions, helmets would have to have a severity index of 300. No current helmet meets the 300 score on the severity index.

### III.  Factual Allegations Concerning Plaintiff

33.    Plaintiff Enriquez's sons were members of their high school football team.

34.    On or about June 2010, Mr. Enriquez went to Riddell's website and saw Riddell's representations that Revolution Helmets were superior to other helmets with respect to preventing concussions.  Relying on those advertisements and statements regarding the concussion reduction capabilities of Revolution Helmets, Enriquez purchased Riddell Revolution Helmets specifically to prevent his sons from sustaining a concussion.   Enriquez purchased additional Revolutions Helmets in 2011.

35.    Enriquez paid several hundred dollars for Riddell Helmets for the purpose of preventing concussions. Enriquez believed those helmets would perform as advertised based on Defendants' representations.   However, no helmet can prevent concussions and Defendants' representations regarding the concussion reduction capabilities of Revolution Helmets were false and misleading.

36.    If Revolution Helmets were capable of reducing the likelihood of concussions, Enriquez would not have suffered the damage and economic loss described herein.

## CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action on behalf of himself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure. The proposed Class is defined as follows:

> All purchasers of Revolution Helmets advertised as having concussion reducing capabilities within the United States from the beginning of the applicable statute of limitations period through the present.

38.     Excluded from the Class are Defendants, Defendants' officers, directors, and employees and those who purchased Defendants' Revolution Helmets for the purpose of resale.

39.     This action is properly maintainable as a class action. The class for whose benefit this action is brought is so numerous and geographically dispersed that joinder of all members is impracticable, and the disposition of their claims in a class action will provide substantial benefits to both the parties and the Court.

40.     A class action is superior to other methods for the fair and efficient adjudication of the claims herein asserted, and no unusual difficulties are likely to be encountered in the management of this class action. Since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation makes it unfeasible or impossible for members of the Class to individually seek redress for the wrongful conduct alleged.

41.     Prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

42.     Rule 23(a)(2) and Rule 23(b)(3) are both satisfied because there are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member. The common questions include, *inter alia*, the following:

    a.   whether Defendants concealed the ineffectiveness of Revolution Helmets in preventing concussions;

    b.   whether Defendants had a sufficient basis for their claims regarding the effectiveness of Revolution Helmets in reducing concussions;

    c.   whether Defendants engaged in unfair, false, misleading, or deceptive acts or practices regarding in the marketing and sale of Revolution Helmets;

    d.   whether Defendants charged and received improper sums based on claims that Revolution Helmets provided benefits they did not;

    e.   whether the Class is entitled to injunctive and other equitable relief, including restitution and disgorgement, and if so, the nature of such relief; and

    f.   whether the Class is entitled to compensatory damages, and if so, the amount of such damages.

43.     Plaintiff's claims and the claims of members of the Class all derive from a common nucleus of operative facts.  That is, irrespective of the individual circumstances of any class member, liability in this matter will rise and fall with a relatively few core issues related to Defendants' statements regarding the effectiveness of Revolution Helmets at reducing concussions.

44.     Plaintiff's claims are typical of the claims of the Class members.  Plaintiff has the same interest as all members of the Class in that the nature and character of the challenged conduct is the same.

45.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff purchased a Revolution Helmet and paid a premium for the product based on Defendants' false claims of concussion safety.  Plaintiff's interests are entirely consistent with, and not antagonistic to, those of the other members of the Class. Plaintiff has retained competent counsel experienced in the prosecution of consumer and class action litigation.

46.     Defendants have acted or refused to act on grounds generally applicable to the Class, making injunctive and declaratory relief appropriate with respect to the proposed Class as a whole.

## **<u>INJURY</u>**

47.     By reason of the above-described conduct, Defendants caused actual harm, injury-in-fact, and loss of money to Plaintiff and the Class. Plaintiff and the Class were injured in the following ways:

    a.  Plaintiff and members of the Class paid several hundred dollars for Defendants' Revolution Helmets for the purpose of preventing concussions based on Defendants' misrepresentations regarding the helmets' safety features;

    b.  If Defendants' Revolution Helmets were capable of reducing the likelihood of concussions as represented, Plaintiff would not have suffered the damage and economic loss described herein;

    c.  Plaintiff and the Class have been deprived of the cost of their Revolution Helmets, requiring restitution; and

d.   Plaintiff and the Class have been deprived of the benefit of their bargains and suffered other damages by purchasing Revolution Helmets which could not lessen the likelihood of concussions as represented.

## CAUSES OF ACTION

### COUNT I
### (BREACH OF CONTRACT)

48.   Plaintiff incorporates the allegations set forth in paragraphs 1 through 47 as if fully set forth herein.

49.   Defendants entered into a contract with Plaintiff and members of the Class to sell helmets of a certain represented grade and quality and carrying specific safety attributes that would reduce the incidence of concussion.

50.   Plaintiff and the Class performed under the contract by providing full payment for the product and benefits promised.

51.   Defendants breached their contracts with Plaintiff and members of the Class by supplying helmets that did not provide the qualities and attributes that were bargained for.

52.   As a direct and proximate result of Defendants' breach of contract, Plaintiff and the Class have sustained economic losses, and are entitled to compensatory damages in an amount to be proven at trial.

### COUNT II
### (VIOLATION OF FLORIDA'S DECEPTIVE TRADE PRACTICES AND UNFAIR COMPETITION ACT, FLA. STAT. § 501.201, ET SEQ.)

53.   Plaintiff incorporates the allegations set forth in paragraphs 1 through 47 as if fully set forth herein.

14

54.     Plaintiff brings this action individually, and on behalf of the Class, pursuant to the Deceptive and Unfair Trade Practices Act which makes unlawful any "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." § 501.204(1), Fla. Stat.

55.     Plaintiff and members of the Class purchased Revolution Helmets based on Defendants' claims that Revolution Helmets would decrease the likelihood of concussions, as compared to traditional helmets.

56.     Defendants misled consumers by stating that Revolution Helmets were better than traditional helmets with respect to preventing concussions.  Defendants knew, or should have known, that their concussion safety claims were false.  Defendants also omitted various material facts surrounding the UPMC study used to back their safety claims which also misled consumers.  Specifically, Defendants omitted:  (1) that the absolute risk change found by the UPMC study was actually 2.6%; (2) that the absolute risk change was within the statistical range of error given the study's limitations; and (3) the types of hits studied in the UPMC study (i.e., open field hits on quarterbacks and wide receivers) rarely occur in the field or occur much less frequently than more common concussion causing impacts.

57.     Defendants' assertions would have deceived any consumer acting reasonably under the circumstances similar to that of Plaintiff who made their decision to purchase Revolution Helmets based on Defendants' statements.

58.     If Plaintiff knew that Revolution Helmets were not safer than traditional helmets, he reasonably would not have paid more to purchase them.  Plaintiff would have purchased a different helmet rather than spend several hundred dollars on Revolution Helmets that afforded

no appreciable increase in safety.   Therefore, Defendants obtained an unfair competitive advantage and obtained Plaintiff's business unfairly.

59.     The acts complained of herein, and each of them, constitute unfair and unlawful business practices in violation of the Florida Deceptive and Unfair Trade Practices Act, § 501.201, *et seq.*  These practices continue to injure Plaintiff, the Class and the general public and cause the loss of money.  These violations have unjustly enriched Defendants at the expense of Plaintiff and members of the Class.   As a result, Plaintiff is entitled to injunctive relief, restitution, and other equitable relief, in addition to damages in an amount to be determined at trial.

### COUNT III
### (VIOLATION OF FLORIDA'S MISLEADING AND FALSE ADVERTISING ACT, FLA. STAT. § 817.40, *ET SEQ.*)

60.     Plaintiff incorporates the allegations set forth in paragraphs 1 through 47 as if fully set forth herein.

61.     Plaintiff brings this action individually, and on behalf of the Class, pursuant to § 817.41(1), Fla. Stat., which states that it is "unlawful for any person to make or disseminate or cause to be made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement."

62.     Misleading advertisements are any statements that are disseminated to the public which are "known or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading" and were made to sell real or personal property.  Fla. Stat. § 817.40(5).

63.     As described herein, Defendants knowingly misrepresented to Plaintiff and members of the Class the true quality of Defendants' merchandise in their advertising.

Specifically, Defendants represented that Revolution Helmets reduced the likelihood of concussions as compared with traditional helmets.  Defendants knew, or should have known, that players wearing Revolution Helmets were not 31% less likely to suffer concussions than those wearing traditional helmets.

64.     Defendants also omitted material facts surrounding the UPMC study, which resulted in their advertisements becoming misleading to Plaintiff.   Among other things, Defendants omitted: (1) that the absolute risk change found by the UPMC study was actually 2.6%; (2) that the absolute risk change was within the statistical range of error given the studies limitations; and (3) the types of hits studied in the UPMC study (i.e., open field hits on quarterbacks and wide receivers) rarely occur in the field or occur much less frequently than more common concussion causing impacts.

65.     Defendants' misleading advertisements were intended to induce, have already induced, and will continue to induce, consumers to choose Revolution Helmets because of the fear of sustaining concussions and the desire to obtain a technology which will minimize that risk.

66.     Plaintiff justifiably relied upon Defendants' misleading statements when making decisions as to which helmet to buy.

67.     As a direct and proximate result of Defendants' conduct, Plaintiff has incurred actual damages, and is entitled to injunctive relief, restitution, and other equitable relief, in addition to damages in an amount to be determined at trial.

## COUNT IV
### (VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)

68.     Plaintiff incorporates the allegations set forth in paragraphs 1 through 47 as if fully set forth herein..

69.     Plaintiff brings this action pursuant to California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et. seq.*

70.     Plaintiff and the Class purchased Revolution Helmets based on Defendants' claims that the helmets were safer than traditional helmets with regard to protection against concussions.

71.     Defendants devised, implemented and directed the marketing scheme that misled Plaintiffs and the general public, which is the subject of this complaint, from their headquarters.

72.     If Plaintiff and members of the Class knew that Revolution Helmets were not safer than traditional helmets, they reasonably would not have paid more to purchase the helmets.  Plaintiff and members of the Class would have purchased a different helmet rather than spend several hundred dollars on Revolution Helmets that afforded no appreciable increase in safety.  Defendants therefore obtained an unfair competitive advantage and obtained Plaintiff's money unfairly.

73.     The substantial harm caused by Defendants' business practices outweighs any benefit, justification or motivation of Defendants.  Plaintiff and members of the Class could not have reasonably avoided or anticipated Defendants' failure to provide products that were properly designed and manufactured to work as advertised.

74.     In addition to being unfair, Defendants' business practices were unlawful because they violated the Consumers Legal Remedies Act ("CLRA"), CAL. CIVIL CODE §§ 1750, *et. seq.*,

breached express and implied warranties, and breached the contracts each had with Plaintiff and members of the Class.

75.     California law does not provide any safe harbor for Defendants' misconduct.

76.     The acts complained of herein constitute unfair and unlawful business practices in violation of the California Unfair Competition Law, CAL. CIVIL CODE § 17200, *et seq*. Such acts and violations have not abated and will continue to occur unless enjoined.

77.     The unfair and unlawful business practices set forth herein have and continue to injure Plaintiff, the Class, and the general public and cause the loss of money. These violations have unjustly enriched Defendants at the expense of Plaintiff and the Class. As a result, Plaintiff and members of the Class are entitled to injunctive relief, restitution, and other equitable relief.

<u>COUNT V</u>
**(VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT, CAL. CIVIL CODE §§ 1750, *ET SEQ*.)**

78.     Plaintiff incorporates the allegations set forth in paragraphs 1 through 47 as if fully set forth herein.

79.     The CLRA's protections, like the UCL's, are cumulative and, therefore, are "in addition to any other procedures or remedies for any violation or conduct provided for in any other law." CAL. CIVIL CODE § 1752.

80.     Defendants are "persons," as that term is defined in CAL. CIVIL CODE § 1761(c), because each is an "individual, partnership, corporation, limited liability company, association, or other group, however, organized."

81.     The transactions described herein were "transactions," as that term is defined in CAL. CIVIL CODE § 1761(e), because they constituted an "agreement between a consumer and

19

any other person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement."

82.     The transactions at issue involve "goods," as that term is defined in CAL. CIVIL CODE § 1761(a), because they involve the purchase and sale of Revolution Helmets, which are tangible chattel bought to be used primarily for personal, family, or household purposes.

83.     By purchasing Revolution Helmets, Plaintiff and members of the Class are "consumers," as that term is defined in CAL. CIVIL CODE § 1761(d), because they sought, by purchase, goods and services for personal, family, or household use.

84.     Venue is proper, pursuant to CAL. CIVIL CODE § 1780(d), because the action is being brought in the county where Defendants are doing business.  A Declaration of Plaintiff establishing this Court as the proper venue for this action is attached hereto as Exhibit "A."

85.     Defendants have each violated CAL. CIVIL CODE §§ 1770(a)(5) and (7). These provisions state:

a.     The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:

* * *

(5)     Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have.

(7)     Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

86.     In violation of CAL. CIVIL CODE § 1770(a)(5), Defendants misrepresented the ability of Revolution Helmets to reduce the risk of and prevent concussions.

87.     In violation of CAL. CIVIL CODE § 1770(a)(7), Defendants misrepresented that their products were of a certain quality and grade, when they were not.  Defendants specifically

20

misrepresented that their Revolution Helmets were better at reducing the risk of concussions versus other helmets based on the UPMC study.

88.     Defendants' violations of CAL. CIVIL CODE § 1770, *et seq.*, have caused damage to Plaintiff and members of the Class and threaten additional injury if the violations continue. This damage includes the loss of the advertised utility of the products purchased by Plaintiff and members of the Class.

89.     At this time, Plaintiff seeks injunctive relief under this cause of action.  By letters dated February 14 and 29, 2012, mailed via certified mail as directed in CAL. CIVIL CODE § 1782, Plaintiff notified Defendants of their violations of the CLRA and demanded that Defendants provide a remedy that rectifies their misconduct. (See copies of correspondence to Defendants Easton-Bell and Riddell attached hereto as Exhibits "B" and "C").  If Defendants fail to respond adequately to Plaintiff's written demand within 30 days, Plaintiff will amend this Class Action Complaint to request damages and other relief as permitted by CAL. CIVIL CODE § 1780.

90.     By reason of the foregoing, Plaintiff and members of the Class are entitled to recover injunctive relief.

## COUNT VI
### (BREACH OF EXPRESS WARRANTY)

91.     Plaintiff incorporates the allegations set forth in paragraphs 1 through 47 as if fully set forth herein.

92.     Among other express warranties, Defendants warranted that Revolution Helmet users were "31 percent less likely to suffer a concussion compared to athletes who wore traditional football helmets."

93.     Defendants have breached their express warranty by not providing Revolution Helmets that are safer than traditional helmets with respect to concussion prevention and which do not provide the benefits described in advertising materials.

94.     Defendants have received notice, by this lawsuit among other means, including public testimony before the U.S. Senate, that Revolution Helmets do not lessen the likelihood of concussions compared to traditional football helmets. In fact, these sources have indicated Revolution Helmets are no safer than traditional helmets with respect to concussion prevention.

95.     Despite being notified repeatedly that Revolution Helmets are no safer than traditional helmets, through this lawsuit and by other means, Defendants have not offered helmets that are safer than traditional helmets with respect to concussion prevention. Therefore, Defendants have each breached their express warranties.

96.     As a direct, proximate, and foreseeable cause of Defendants' breach of express warranty, Plaintiff and members of the Class have sustained damages in an amount to be proven at trial.

## COUNT VII
### (BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE)

97.     Plaintiff incorporates the allegations set forth in paragraphs 1 through 47 as if fully set forth herein.

98.     By operation of law, Defendants provided an implied warranty of fitness for a particular purpose with each of the Revolution Helmet units at issue, warranting, among other things, that they specifically reduce or prevent the occurrence of concussions.

99.     Plaintiff purchased Revolution Helmets due to Defendants' warranty that Revolution Helmets reduce the occurrence of concussions. Defendants, as evidenced by and through their advertising, knew or had reason to know that Plaintiff relied on this warranty.

100.    The particular purpose for which Plaintiff selected Defendants' products was the prevention of concussion.  Defendants, as evidenced by their advertising and representations, had reason to know that Plaintiff sought Revolution Helmets for the particular purpose of reducing the likelihood of sustaining concussions.  Plaintiff's purpose, and Defendants' knowledge of that purpose, is plain from the fact that Revolution Helmets pervasively tout their supposed concussion-reducing capabilities and cost more than traditional helmets.

101.    Defendants received timely notice, by this lawsuit and through other means, that Revolution Helmets do not lessen the likelihood of concussions compared to traditional football helmets.  Despite being notified, Defendants have not provided Plaintiff a product that conforms to the qualities and characteristics that Defendants warranted when it sold the Revolution Helmets at issue.

102.    Defendants breached their implied warranty of fitness for a particular purpose by providing Revolution Helmets that were no safer than traditional helmets with respect to concussion prevention.

103.    As a direct, proximate, and foreseeable cause of Defendants' breach of the implied warranty of fitness for a particular purpose, Plaintiff and members of the Class have sustained damages.

## COUNT VIII
### (UNJUST ENRICHMENT)

104.    Plaintiff incorporates the allegations set forth in paragraphs 1 through 47 as if fully set forth herein.

105.    As a result of the conduct described herein, Plaintiff and members of the Class paid monies to Defendants to which Defendants were not entitled. Defendants have voluntarily accepted and retained these monies with full knowledge that they  did not provide products of the

quality, nature, fitness, or value that had been represented or that reasonable consumers expected.

106.    Because of the acts set forth herein, Defendants have been unjustly enriched.

107.    Plaintiff and members of the Class are entitled to restitution of the amounts Defendants unjustly charged and received as described herein.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff prays for relief as follows:

a.  That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be certified as class representative and Plaintiff's counsel be appointed as counsel for the Class;

b.  That the unlawful conduct alleged herein be declared to be illegal and in violation of the state and common law claims alleged herein;

c.  That Defendants be enjoined from engaging in the same or similar  practices alleged herein;

d.  That Plaintiff and members of the Class recover damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiff and members of the Class;

e.  That Plaintiff and members of the Class receive restitution and disgorgement of all Defendants' ill-gotten gains;

f.  That Plaintiff and members of the Class receive pre-judgment and post-judgment interest as allowed by law;

g.  That Plaintiff and members of the Class recover their costs of the suit, and attorneys' fees as allowed by law; and

h.  All other relief allowed by law and equity.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

s/ Kevin B. Love
Kevin B. Love
Fla. Bar No. 993948
Jason G. Andrew
Fla. Bar No. 075011
**CRIDEN & LOVE, P.A.**
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Telephone: (305) 357-9000
Fax: (305) 357-9050
Email: klove@cridenlove.com

Daniel E. Gustafson
Jason S. Kilene
David A. Goodwin
**GUSTAFSON GLUEL, PLLC**
650 Northstar East
608 Second Avenue South
Minneapolis, MN  55402
Telephone: (612) 333-8844
Fax: (612) 339-6622
Email: dgustafson@gustafsongluek.com
        jkilene@gustafsongluek.com
        dgoodwin@gustafsongluek.com

Charles S. Zimmerman
J. Gordon Rudd, Jr.
Brian C. Gudmundson
**ZIMMERMAN REED, PLLP**
1100 IDS Center

25

80 South Eighth Street
Minneapolis, MN 55402
Telephone (612) 341-0400
Facsimile (612)341-0844
Email:  charles.zimmerman@zimmreed.com
          gordon.rudd@zimmreed.com
          brian.gudmundson@zimmreed.com


Richard A. Lockridge
Yvonne M. Flaherty
**LOCKRIDGE GRINDAL NAUEN, P.L.L.P.**
100 Washington Ave S., Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Fax: (612) 339-0981
Email:      ralockridge@locklaw.com
          ymflaherty@locklaw.com


Garrett D.  Blanchfield
Brant Penney
**REINHARDT WENDORF & BLANCHFIELD**
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN  55101
Telephone: (651)-287-2100
Fax: (651)-287-2103
Email:      g.blanchfield@rwblawfirm.com
          b.penney@rwblawfirm.com

Simon B. Paris
**SALTZ MONGELUZZI BARRETT & BENDESKY, PC**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Telephone: 215-575-3986
Fax: (215) 496-0999
Email:      sparis@smbb.com